# IN THE UNITED STATES DISTRICT COURT

# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN W. KICHMAN, | CASE NO. 1:15-cv-00957-YK-GBC |
| Plaintiff, | (JUDGE KANE) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 9, 10, 12, 14, 15 |

## REPORT AND RECOMMENDATION

### I.      Procedural Background

On January 21, 2011, John W. Kichman ("Plaintiff") filed as a claimant for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34, 1181-1183f, with a date last insured of December 31, 2013,[1] and an amended disability onset date of January 2, 2011, which coincided with Plaintiff's release from incarceration.   (Administrative Transcript (hereinafter, "Tr."), 16-17, 146). After the claim was denied at the initial level of administrative review, the Administrative Law Judge (ALJ) held a hearing on July 2, 2012.  (Tr. 68-121).  On

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord Renfer v. Colvin*, No. 3:14CV611, 2015 WL 2344959, at *1 (M.D. Pa. May 14, 2015).

September 25, 2012, the ALJ found that Plaintiff was not disabled within the meaning of the Act.  (Tr. 143-162).  On November 15, 2013, the Appeals Council remanded the matter.  (Tr.  163-68).  On April 17, 2014, the ALJ held a second hearing.  On June 3, 2014, the ALJ again found that Plaintiff was not disabled within the meaning of the Act.  (Tr. 13-37).  Plaintiff again sought review of the unfavorable decision, which the Appeals Council denied on March 17, 2015, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner.  (Tr. 1-7).

On May 15, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration ("SSA") denying social security benefits.  (Doc. 1).  On July 15, 2015, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings.  (Doc. 9, 10).  On August 30, 2015, Plaintiff filed a brief in support of the appeal.  (Doc. 12 ("Pl. Brief")).  On October 1, 2015, Defendant filed a brief in response.  (Doc. 14 ("Def. Brief")).  On October 8, 2015, Plaintiff filed a reply brief.  (Doc. 15 (Reply Brief)).  On January 11, 2016, the Court referred this case to the undersigned Magistrate Judge.

///

///

## II.      Relevant Facts in the Record

## A. Education, Age, and Vocational History

Plaintiff was born in May 1968 and was classified by the Regulations as a younger individual through the date of the ALJ decision.  (Tr. 21); 20 C.F.R. § 404.1563(c).  He completed the twelfth grade and completed a few college courses in construction technology in 2000 and business courses in 2009 while incarcerated.  (Tr. 85-86).  Plaintiff testified that he received $1,661 in monthly disability benefits from the Department of Veterans Affairs (VA) based on a disability rating of 90 percent.  (Tr. 84).[2]  Plaintiff testified that he also received a monthly rental income of $650.  (Tr. 85).  Plaintiff's past relevant work includes employment as a construction worker and a postmaster in the Army.  (Tr. 28-29).  Plaintiff has been living along since his amended onset date of January 2, 2011.  (Tr. 76).  Plaintiff works as a real estate agent and gets paid only on commission.  (Tr. 77).  During the July 2012 hearing, Plaintiff testified that he spends two three-hour periods with phone duties with the company and approximately one hour weekly visiting homes.  (Tr. 77-78).  Plaintiff testified that while working with phone calls for the two to three hour periods he is allowed to freely sit, stand, and walk.  (Tr. 78).

///

---

[2] A letter dated March 21, 2011, summarized Plaintiff's 90 percent disability rating.  (Tr. 519-20).

## B.  Relevant Treatment History and Medical Opinions

### 1.      Hershey Medical Center: Khuram Kazmi, M.D.

On May 23, 2007, Plaintiff underwent an MRI of his lumbar spine.  (Tr.

546).  Dr. Kazmi found that there was:

> grade 1 retrolisthesis of L5 on S1. The vertebral body heights [were] preserved. The marrow signal [was] within normal limits for the patient's age. The conus medullaris appear[ed] unremarkable terminating at approximately the L1 level. There [were] no paraspinal masses seen. There [was] multilevel disc desiccation, most prominent at L5/S1. Review of the individual disc space levels demonstrate[d] a diffuse disc bulge at L5/S1 with a more focal left foraminal protrusion. There [was] left foraminal narrowing. There is no significant spinal canal stenosis. The remaining visualized levels demonstrate[d] no disc herniation, spinal canal or foraminal stenosis.

(Tr. 546).  Dr. Kazmi concluded that Plaintiff had "[d]egenerative disc disease at

L5/S1 with grade 1 retrolisthesis and small left foraminal protrusion causing

foraminal narrowing at this level."  (Tr. 546).

### 2.      VA Medical Center: Syed Rashid, M.D.; Sherri Passarell, M.D.; Paul Harig, Ph.D.; John R. Huggins, P.T.; Sevdalina Bosgnakov, M.D.; Jody Searight, PA-C; Wanda Yost, LPN, Thomas Murray, counselor; Tejpal Singh, M.D.; Aida Rjepaj, M.D.; Amy Kucirka, Psy.D.; Duc Kim Hoang, M.D.; Padma Surapaneni, M.D.; S. J. McGarrity, M.D., Paul Tiger, M.D.; Amol Chaugule; Cheryl Green, P.A.-C.

On June 5, 2007, Dr. Boshnakov noted that Plaintiff's MRI of the

lumbosacral spine showed degeneration at disc L5-S1 and some disc protrusion.

(Tr. 581).  Dr. Boshnakov recommended NSAIDs.  (Tr. 381-82).  On July 5, 2007,

Plaintiff reported that he was unable to stand for more than an hour and that he

could not bend over to tie his shoes.  (Tr. 580).  Plaintiff reported experiencing pain of five or six out of ten indicating the highest severity and experiencing ten out of ten level of pain within the past two weeks.  (Tr. 580).  An MRI dated May 23, 2007, demonstrated:

> grade 1 retrolisthesis of L5 on S1 the vertebral body heights are preserved . . . . conus medullaris appears unremarkable terminating at approximately the Ll level. there are no paraspinal masses seen. there is multilevel disc dessication, most prominent at L5/Sl. review of the individual disc space levels demonstrates a diffuse disc bulge at L5/Sl with a more focal left foraminal protrusion. there is left foraminal narrowing. there is no significant spinal canal stenosis. the remaining visualized levels demonstrate no disc herniation, spinal canal or foraminal stenosis.

(Tr. 580-81).   Upon examination, the physical therapist noted that Plaintiff exhibited no obvious pain on ambulation and Plaintiff reported that he felt more 'pressure' when his left foot is in stance phase.   (Tr. 581).   Plaintiff also demonstrated a "significant limitation in standing low back flexion." (Tr. 581).

In a psychiatric record dated, August 15, 2007, Plaintiff reported that his anger problems were "out of control" and said he would not be able to hold a regular job. (Tr. 577).  Plaintiff reported that he would erupt into anger when they do not follow his correction when they do something wrong. (Tr. 577).  Plaintiff reported being charged with simple assault, reckless driving, stalking, harassing a witness, and other charges due to hitting his estranged wife's car while he was driving. (Tr. 578). Dr. Passarell noted that Plaintiff was cooperative, and that his

memory and concentration were intact.  (Tr. 578).   Dr. Passarell opined that Plaintiff's insight was impaired and his judgement was intact.  (Tr. 578).   Dr. Passarell diagnosed Plaintiff with: 1) mild PTSD; 2) personality disorder, NOS; 3) obsessive-compulsive personality disorder, and; 4) paranoid personality disorder traits.  (Tr. 578).   Dr. Passarell assessed Plaintiff with a GAF score of 65.   Dr. Passarell concluded that she was unsure whether Plaintiff's reported symptoms reflected more of an adjustment disorder or dysfunctional personality traits.  (Tr. 579).

In a psychiatric record dated, August 17, 2007, it was noted that this was Plaintiff's first therapy visit after transition from Dr. Trambley.  (Tr. 577).   Dr. Harig opined that Plaintiff's PTSD was in partial remission and that paranoid thinking still remained and was influenced by overgeneralization.  (Tr. 577).

On September 12, 2007, Plaintiff reported improvement with decreased level of anger, and although he still has some irritability, this seems to be going away. (Tr. 575).  Plaintiff reported that he thought that he was still having nightmares, but doesn't remember them.  (Tr. 575).  Plaintiff also reported that his motivation decreased, that he had been taking medications as prescribed and that the medication caused him to sleep ten to twelve hours when previously he never had any problems with being able to wake up.  (Tr. 575).  Upon evaluation Dr. Passarell opined that Plaintiff's memory was intact, he possessed good insight, and

his judgement was intact.  (Tr. 576).  Dr. Passarell assessed Plaintiff with a GAF score of 75.  (Tr. 576).

In a psychiatric record dated, November 14, 2007, Plaintiff reported that he was compliant with his medication and did not experience any side-effects.  (Tr. 574).  Plaintiff reported sleeping better with the prazosin, however, may be sleeping too much.  (Tr. 574).  Dr. Rashid noted that Plaintiff was experiencing "numerous stressors."  (Tr. 574).  Plaintiff stated that he wanted to see another psychologist for his individual therapy.  (Tr. 574).

On January 9, 2008, Dr. Rashid noted that Plaintiff had a "temper problem and possibly explosive dysfunctional personality disorder."  (Tr. 573).  Dr. Rashid noted that Plaintiff conversed coherently and rationally, however, "[verbalized] some paranoid thoughts and stated that he did not like people walking close by him in the mall."  (Tr. 573, 663).   Plaintiff reported that he still had legal matters and court hearings regarding his divorce, driving his wife off the road, and expecting to be sent to jail.  (Tr. 573).   Dr. Rashid opined that Plaintiff exhibited "possible manipulative traits" noting that Plaintiff wanted him to write a letter saying that jail confinement would not be good for him and Dr. Rashid denied the request.  (Tr. 573).   Dr. Rashid continued Plaintiff's diagnosis of mild PTSD and added personality disorder, NOS with paranoid features.  (Tr. 573).  Dr. Rashid decreased

the dosage of Prazosin to treat his nightmares, continued Plaintiff's dosage of Sertraline for his depression and anger outbursts, and added risperidone.

In an initial therapy session dated January 11, 2011, Mr. Murray noted that Plaintiff was released from state prison on January 2, 2011, after two years and nine months of incarceration and that he has two years of parole.  (Tr. 673).

In a therapy session dated January 21, 2011, Plaintiff reported undergoing substance abuse treatment during incarceration and stated that he could not safely drink without the risk of over drinking.  (Tr. 672).  Plaintiff indicated that he did not receive treatment for PTSD while incarcerated and acknowledge that much of his alcohol use stemmed from self-medicating to address problems with sleep, stress and anger.  (Tr. 672).

In a medical record dated January 25, 2011, it was noted that Plaintiff was released from incarceration and would be on parole until 2013.  (Tr. 658).  In an intake assessment dated February 1, 2011, Plaintiff reported experiencing: 1) difficulty concentrating, learning, or recalling information; 2) significant impairment in social or occupational functioning; 3) excessive fatigue; 4) disturbed sleep with four to seven hours of sleep a night and waking up to three times each night; 5) headache; 6) vertigo or dizziness; 7) irritability or aggression (with little or no provocation); 8) anxiety; 9) depression; 10) changes in personality, and; 11) slowed thinking.  (Tr. 668, 670).

On February 1, 2011, Plaintiff stated that he was perusing a hearing to regain his real estate license and indicated that was not sure if he could resume other work due to his back symptoms stating that with real estate he could sit, stand, and walk at various times and if he remained in any position for a prolonged time, that was when he experienced problems.  (Tr. 672).  In February 2011, Plaintiff had BMIs that fell within the obese range.  (Tr. 728).  Plaintiff had a positive traumatic brain injury screen dated February 3, 2011.  (Tr. 657-58, 667).

In a record dated February 14, 2011, Plaintiff sought treatment for his chronic low back pain.  (Tr. 647).  Plaintiff reported that he did not want to be treated with medications, but rather wanted therapy.  (Tr. 647).  Plaintiff also reported suffering from insomnia where he gets a few hours of sleep a night and sometimes awakes angry due to his PTSD.  (Tr. 647).  Plaintiff reported that he was stable on current medications and that he continued to try to exercise on a regular basis.  (Tr. 647).  In his medical history it was noted that on February 3, 2011, Plaintiff had a concussion with a loss of consciousness.  (Tr. 647).  Plaintiff reported that his pain was a 4.  (Tr. 647).  Ms. Searight recommended treating Plaintiff with an NSAID and referred him for physical therapy and a pain injection.  (Tr. 647).  Plaintiff's BMI was noted along with a note summarizing the health risks with being overweight.  (Tr. 648-49).  It was noted that he would benefit from a weight management program, however, Plaintiff was not interested in

participating in the weight management program.  (Tr. 649).  Ms. Searight also noted that Plaintiff was experiencing "some depressive symptoms requiring further investigation.  (Tr. 649).  In another record dated February 14, 2011, Ms. Yost noted that Plaintiff was able to move independently, that he did not have any hearing impairment, and with regards to pressure ulcer risk, noted that Plaintiff walked frequently.  (Tr. 651, 53).  It was also noted that Plaintiff did not have trouble hearing or understanding.  (Tr. 650).

In a medical record dated February 16, 2011, it was noted that Plaintiff was prescribed lorazepam for his anxiety and sleep symptoms, however he reported not taking all prescribed doses of medication in the last two weeks.  (Tr. 722).

On February 22, 2011, Plaintiff reported that the day prior he discovered that he had to complete fourteen hours of online classes for his real estate license and completed four hours so far.  (Tr. 671).  In a therapy session dated February 23, 2011, Plaintiff "stated he really [was] not interested in psychotherapy; he prefer[ed] to be treated with medication only."  (Tr. 721).  Plaintiff "declined to schedule any further psychotherapy appointments."  (Tr. 721).

In a TBI/Polytrauma consultation report dated February 24, 2011, Dr. Hoang assessed Plaintiff with a GAF score of 55.  (Tr. 752).  Dr. Hoang observed that Plaintiff "ambulated independently without the use of an assistive device."  (Tr. 752).  Plaintiff reported that he did not take medication for his headaches as they

do not interfere with activities.  (Tr. 753).  Upon examination of Plaintiff's back, Dr. Hoang observed that there was no spasm, no lower extremity weakness, no fixed spine deformity, and Plaintiff had normal curvature and normal sensory examination.  (Tr. 756).  It was also noted that Plaintiff exercised three times a week. (Tr. 909).

On March 15, 2011, Plaintiff underwent a chronic pain evaluation focusing on psychological factors that may interfere with pain management.  (Tr. 716). Plaintiff arrived "ambulatory and unescorted," and "walked normally and without significant difficulty."  (Tr. 717).  Plaintiff stated that the medications that he was taking now do not work, and in the past he has found Vioxx helpful.  (Tr. 717). Plaintiff stated that he was trying to stay away from medications as much as possible and that his current level of pain was "5-6/10 without taking pain medications'' and an acceptable level of pain would be ''3/10.''  (Tr. 717).  I was noted that a review of Plaintiff's medical chart recorded pain ratings ranging from ''3/10'' to ''10/10' over the past year.  (Tr. 717).  It noted that Plaintiff had previously seen Dr. Caplan for psychotherapy and declined further follow-up as he preferred psychotropic medication. (Tr. 718).  Plaintiff reported that he spends the day on the computer, watching his dogs, cleaning the house, and going school. (Tr. 718).  Plaintiff stated that he "used to like to go on long walks, play sports (e.g., softball, volleyball), cut wood, and do carpentry work, but cannot now due to

the pain." (Tr. 718).  Plaintiff reported that the pain has affected his ability to provide self-care in the sense that he has to wear slip on shoes and he avoids activities that aggravate his pain.  (Tr. 718).  Based on an assessment of Plaintiff's adaptive and maladaptive beliefs regarding chronic pain, Dr. Kucirka opined that Plaintiff's "Adaptive Beliefs scales" and "Maladaptive Beliefs scales" were in the subclinical range and that he might benefit from skill training and encouragement to increase the beliefs that he has control over pain and "decrease the beliefs that one is necessarily disabled by pain, that pain is a signal of damage, and that it is the responsibility of health care professionals, and not the patient, to manage his chronic pain condition." (Tr. 718-19).  Dr. Kucirka also noted that Plaintiff "scored very high on the Pain Treatment Response scale indicating that it was probable that psychological factors might maintain the pain behaviors." (Tr. 719).

On March 16, 2011, Plaintiff underwent a CT of his spine and Dr. Singh concluded that Plaintiff had "[m]ild to moderate left neuroforaminal stenosis and mild right neuroforaminal stenosis at LS-S1" and "[m]ild left neuroforaminal stenosis at L4-L5.  (Tr. 688).  On the same day, Plaintiff reported experiencing a pain level of six where ten is the greatest, that sitting was difficult and painful, and that he was taking extended classes in order to obtain his real estate license.  (Tr. 715).  It was noted that Plaintiff could walk a limit of 200 feet, he leaned to the

right as he ambulated, and was "firm in rejection of possible use of forearm crutches." (Tr. 715).

On March 22, 2011, Plaintiff reported that he was not taking any medications for his headaches because they were not working. (Tr. 712).

On March 29, 2011, underwent a psychiatric evaluation. (Tr. 708). Plaintiff reported that he continued to struggle with depression and PTSD, that he slept poorly at night due to frequently waking up with anxiety and with heart palpitations. (Tr. 709). Plaintiff described his mood as sad and irritable and reported that he gets irritable and has very poor frustration tolerance. (Tr. 709). Plaintiff reported experiencing occasional flashbacks triggered by certain stimuli and becomes very hypervigilant when in certain settings, such as when driving or in crowded places. (Tr. 709). Plaintiff reported that he tries to avoid being in crowded areas and that he continues to be jumpy and has an exaggerated startle response. (Tr. 709). According to Plaintiff, his energy level is very low, he sleeps for a few hours during the day, finds it difficult to focus or concentrate on anything, and he wants to be left alone. (Tr. 709). Dr. Rjepaj noted that Plaintiff had no history of suicide attempts or inpatient psychiatry treatment. (Tr. 709). Dr. Rjepaj noted that when he was treated in 2006 when the patient was undergoing a difficult divorce, he was prescribed Zoloft, Xanax and lorazepam and Plaintiff quit taking Zoloft due to side effects while Xanax and Ativan were being used on an as

needed basis only. (Tr. 709). Dr. Rjepaj noted that Plaintiff was currently prescribed Ativan, "which he uses rarely." (Tr. 709). Plaintiff regularly sees his 17-year-old daughter and maintains regular contact with his parents. (Tr. 709-10). Plaintiff reported that although he was not currently working, he would like to get started in the real estate business. (Tr. 710). Dr. Rjepaj opined that Plaintiff's insight and judgment were "preserved" with regard to illness and treatment-related decision making. (Tr. 710). Dr. Rjepaj diagnosed Plaintiff with PTSD and major depressive disorder, and assessed Plaintiff with a GAF score of 55. (Tr. 710). Dr. Rjepaj started Plaintiff with 7.5 mg of Remeron. (Tr. 710).

On April 28, 2011, Dr. Tiger opined that Plaintiff's insight and judgement was fair and assessed him with a GAF score of 55. (Tr. 877-78). On May 16, 2011, Plaintiff's "hearing loss and tinnitus is relatively mild." (Tr. 873, 892).

On May 26, 2011, Dr. Hoang noted that Plaintiff ambulated independently without the use of any assistive device. (Tr. 871). On June 21, 2011, Dr. McGarrity observed:

> Good range of motion of the cervical spine. Lumbar spine limited range of motion with limited forward flexion to approximately 30 degrees, extension with pain. There is tenderness over the right SI joint. Patrick's test is positive. There is tenderness over the mid thoracic and also low lumbar spine in the paraspinous musculature.

(Tr. 864). Dr. McGarrity opined that Plaintiff's current low dose of Meloxicam has been helpful, there was no indication of neuropathic pain, there was no

indication for opioid use to address the pain, and weight loss would be helpful. (Tr. 865).

On July 27, 2011, Plaintiff reported anxiety and depression. (Tr. 854). Dr. Rjepaj opined that Plaintiff's insight and judgement were preserved with regard to illness and treatment-related decision making, and assessed Plaintiff with a GAF score of 60. (Tr. 854-55).

In a record dated September 1, 2011, Plaintiff did not report any changes, and his medication fully addressed his insomnia while other symptoms remained such as anxiety, depression, irritability, low frustration tolerance, and diminished energy level.    (Tr. 821-22).   Dr. Rjepaj opined that Plaintiff's insight and judgment is preserved with regard to illness and treatment-related decision making and started Plaintiff on Abilify. (Tr. 822). Dr. Rjepaj assessed Plaintiff with a GAF score of 60. (Tr. 822).

In a record dated September 20, 2011, Plaintiff reported that he still had "occasional nightmares according to what medication [he was] taking." (Tr. 819). Plaintiff reported that he was getting some sleep and that he could adjust his work schedule, so it was "not a big deal." (Tr. 820).

On September 23, 2011, Plaintiff sought treatment for a right arm laceration which resulted from Plaintiff using an electric plumbing snake. (Tr. 818).

On October 6, 2011, Dr. Surapaneni observed that Plaintiff ambulated independently and without the use of an assistive device.  (Tr. 796).  Plaintiff reported working part-time in real estate, however experiences difficulty with motivation and fatigue.  (Tr. 797).  Plaintiff reported that he walks twice a week. (Tr. 798).  On October 7, 2011, Plaintiff reported that he was "doing significantly better at this time," that his depression had lifted since his last visit, he felt calmer and more relaxed, his irritability was "under much better control," his flashbacks and hypervigilance have decreased, and he slept well and had no nightmares.  (Tr. 794).  Dr. Rjepaj opined that Plaintiff's insight and judgement were preserved with regard to illness and treatment-related decision making, that there was no evidence of depression or anxiety at the present time, and assessed Plaintiff with a GAF score of 65.  (Tr. 794-95).  Dr. Rjepaj decreased the dosage of remeron because of Plaintiff's complaint of fatigue, however, the following week Plaintiff reported that he had drastic disruption of sleep since the decrease.  (Tr. 787-88, 794-95).

On October 27, 2011, Plaintiff reported bilateral hand pain and numbness with increased numbness with distant driving.  (783-84).  Examination revealed positive tinel signs in both wrists and active range of motion of the wrists to be within normal limits.  (Tr. 784).  Dr. Hoang concluded that the abnormal electrodiagnostic study was consistent with bilateral carpel tunnel syndrome

("CTS").  (Tr. 785).  Dr. Hoang also noted that there was "no apparent peripheral polyneuropathy" and "no apparent cervical radiculopathy."  (Tr. 785).

On November 17, 2011, Plaintiff reported "doing very well with regard to his PTSD symptoms," felt that the current medication combination worked well, and denied feeling anxious or depressed.  (Tr. 993).  Plaintiff reported that he no longer felt irritable and was satisfied with the level of current symptom control.  (Tr. 993).  Plaintiff reported that he slept well at night, no long experienced nightmares, and symptoms of flashbacks and hypervigilance were minimal.  (Tr. 993).  Plaintiff reported that fatigue was the only problem that he still experienced.  (Tr. 993).  Dr. Rjepaj opined that there was no evidence of anxiety or depression at the time, Plaintiff's PTSD symptoms remained stable, Plaintiff's insight and judgement were preserved with regards to his treatment-related decision making, and assessed Plaintiff with a GAF score of 65.  (Tr. 993-94).

On December 20, 2011, Plaintiff reported that he continues to experience fatigue but he had not yet started using his C-PAP.  (Tr. 986).  Plaintiff reported that he was doing very well with regards to PTSD symptoms and denied feeling anxious or depressed.  (Tr. 986).  Dr. Rjepaj opined that Plaintiff was "doing well and remain[ed] stable."  (Tr. 987).  Dr. Chaugule opined that Plaintiff's insight and judgement were preserved with regards to his treatment-related decision making and assessed Plaintiff with a GAF score of 65.  (Tr. 986-87).

On February 3, 2012, Plaintiff indicated that he wanted to continue with conservative treatment for his bilateral carpel tunnel syndrome. (Tr. 969). Upon examination, Dr. Hoang noted that Plaintiff demonstrated improvement with conservative treatment. (Tr. 970).

On February 21, 2012, Plaintiff reported feeling more depressed, drained, and fatigued from interrupted sleep. (Tr. 961). Plaintiff reported that he is not getting much benefit from his CPAP device and that it had been adjusted recently. (Tr. 961). Plaintiff reported that he went to the gym three times a week, but sometimes he overexerts himself. (Tr. 961). Plaintiff felt that his PTSD was under control and that he had normal dreams. (Tr. 961). Dr. Rjepaj opined that Plaintiff's PTSD symptoms remained stable, he continued to experience fatigue, there was no evidence of depression or anxiety at the time, Plaintiff's insight and judgement were preserved and assessed Plaintiff with a GAF score of 61-70. (Tr. 961, 965-66).

On March 16, 2012, it was noted that reading information from his continuous positive airway pressure (CPAP) device revealed that Plaintiff used it roughly eight hours a night but was still having snoring events, so his device settings were adjusted. (Tr. 959).

In April 2012, Plaintiff was wearing splints while sleeping and exercising, which provided improvement with the CTS. (Tr. 953, 969-970, 1140). He elected

to continue with conservative measures.  (Tr. 970).  On April 19, 2016, Plaintiff reported that his CPAP device was working well to treat his sleep apnea, and felt rested and functioning well during the day.  (Tr. 951).  Plaintiff reported that he continues to try to exercise on a regular basis.  (Tr. 951).  It was also noted that Plaintiff's bilateral carpel tunnel-currently was treated with splints for sleeping and exercises.  (Tr. 952).  On the same day, it was noted that with regards to pressure ulcer risk, Plaintiff walked frequently.  (Tr. 956-57).  On April 19, 2012, Plaintiff reported that his CPAP device worked well, that he felt rested, functioned well during the day, and that he continued to try to exercise on a regular basis.  (Tr. 1138).

On April 23, 2012, Plaintiff reported doing well and without any major problems or concerns.   (Tr. 1135).   Plaintiff reported improvement of his symptoms since his last visit, noting that this motivation and energy level have markedly improved.  (Tr. 1135).  Plaintiff's PTSD symptoms remained under control, he denied feeling anxious or depressed, and no longer felt irritable.  (Tr. 1135).  Upon examination, Dr. Rjepaj noted that Plaintiff's insight and judgement were preserved and that there was no evidence of depression or anxiety at the time of examination and assessed Plaintiff with a GAF score of 65.  (Tr. 1136).

In a report dated May 3, 2012, in the section indicating the frequency of Plaintiff's exercise, it noted "minimal due to back pain." (Tr. 946).  Also on May,

3, 2013, Plaintiff reported that his providers concluded that a lot of his fatigue problems were related to sleep apnea, the right dosage for his medications has helped greatly and that he felt rested. (Tr. 1132). Plaintiff denied alcohol and drug use. (Tr. 1132).

On May 21, 2012, Plaintiff reported that his hands had been shaking for the past two weeks and that his energy level had completely "dropped off." (Tr. 944, 1130). On April 23, 2012, Plaintiff reported that he was doing well and did not have any major problems or concerns. (Tr. 949). Plaintiff reported an improvement of his symptoms since his last visit, noting that his motivation and energy level had markedly improved. (Tr. 949) Plaintiff reported that he self-increased the dose of remeron to 15mg at bedtime with good result and no side effects. (Tr. 949). Plaintiff reported experiencing good sleep without nightmares, his PTSD symptoms remain under control, he no longer felt anxious, depressed, or irritable. (Tr. 949). Upon examination, Dr. Rjepaj noted that Plaintiff's insight and judgement were preserved and that there was no evidence of depression or anxiety at the time of examination and assessed Plaintiff with a GAF score of 65. (Tr. 949-50).

On June, 29, 2012, Plaintiff reported that he was doing well until 3-4 weeks ago, when his energy level dropped and some depression symptoms reemerged. (Tr. 1128). Plaintiff was unable to identify any precipitating causes to the recent

depression symptoms.  (Tr. 1128).  Plaintiff denied feeling said or irritable at the time, but reports that he lacks the motivation and energy to engage in his daily activities and has to push himself to get ready for work.  (Tr. 1128-1129).  Plaintiff reported that his PTSD symptoms remained under control and he was not anxious. (Tr. 1129).   Upon examination, Dr. Rjepaj noted that Plaintiff's insight and judgement were preserved and that there was "mild depression present," no anxiety at the time of examination, and assessed Plaintiff with a GAF score of 65.  (Tr. 1129).

On August 28, 2012, Plaintiff reported no major changes since the last visit and that he uses his CPAP device regularly, and that he continued to struggle with fatigue noting that there are good days and bad days, however, he was unable to identify any triggers.  (Tr. 1123).  Plaintiff denied feeling depressed or irritable and continued to work and function well at work.  (Tr. 1123).  Plaintiff reported that his PTSD symptoms remain under control and he did not feel anxious.  (Tr. 1123). Upon examination, Dr. Rjepaj noted that Plaintiff's insight and judgement were preserved and that there was "some depression present," and no anxiety at the time of examination, and assessed Plaintiff with a GAF score of 65.  (Tr. 1123-1124).

On December 18, 2012, Plaintiff reported no major changes since the last visit and that he continues to struggle with fatigue but he also unknowingly takes off his CPAP during the night.  (Tr. 1119).  Plaintiff reported no benefit in energy

level from an increase in Wellbutrin. (Tr. 1119). Plaintiff denied feeling depressed or irritable and continued to work and function well at work. (Tr. 1119). Plaintiff reported that his PTSD symptoms remain under control and he did not feel anxious. (Tr. 1119). Upon examination, Dr. Rjepaj noted that Plaintiff's insight and judgement were preserved and that there was no evidence of depression or anxiety at the time of examination and assessed Plaintiff with a GAF score of 65. (Tr. 1119-1120). Dr. Rjepaj counseled Plaintiff regarding the importance of exercise and a healthy diet. (Tr. 1120).

On January 17, 2013, it was noted that Plaintiff's carpal tunnel syndrome was stable with splints, his fatigue has improved, his CPAP adjusted, and that he had lost twenty pounds since July 2012 due to diet and exercise. (Tr. 1101). Ms. Green opined that Plaintiff's fatigue would decrease as he lost more weight. (Tr. 1101). Plaintiff reported that he continued to work in real estate. (Tr. 1101).

In a pressure ulcer risk assessment dated January 29, 2013, it was noted that Plaintiff walked frequently. (Tr. 1098-99). On March 22, 2013, Plaintiff reported doing well and expressed that he did not have any major problems or concerns. (Tr. 1093-94). While his energy level was not optimal, he is learning to deal with that. (Tr. 1094). Plaintiff denied any symptoms of depression, anxiety, or irritability and reported that his PTSD symptoms remained under control. (Tr. 1094). Plaintiff reported that he slept and ate well, and that he was functioning

well at his job.  (Tr. 1094).   Dr. Rjepaj opined that there was no evidence of depression or anxiety at the time and assessed him with a GAF score of 65.  (Tr. 1094).   On March 30, 2013, an assessment indicated that his mobility was "independent." (Tr. 1089).

On June 26, 2013, Plaintiff reported no changes since the prior visit, reported that he was doing well, without any major problems or concerns at the time, and while his energy level was not optimal, it was manageable. (Tr. 1083). Plaintiff denied any symptoms of depression, anxiety, or irritability and reported that his PTSD symptoms remained under control.  (Tr. 1083).  Dr. Rjepaj opined that there was no evidence of depression or anxiety at the time and assessed him with a GAF score of 65.  (Tr. 1084).

On July 2, 2013, Plaintiff reported that he was stable on current medications and tries to exercise several days a week.  (Tr. 1080).

In records dating from October 1, 2013, to November 4, 2013, indicated that Plaintiff was a "no show" for his mental health appointment.  (Tr. 1075-1078).

On March 6, 2014, Dr. Rjepaj noted that Plaintiff was last seen in June 2013 and had missed several appointments since that time.  (Tr. 1071).   Plaintiff reported symptoms of depression, poor sleep, and excessive alcohol use since his last visit.  (Tr. 1068, 1071).  Plaintiff reported that he continued to drink eight to ten beers a day for three to four times a week and off-and-on marijuana use with

the last use having been ten days prior.  (Tr. 1071, 1073).  Plaintiff reported that he inconsistently takes his medication and that he has been depressed since the summer of 2013.  (Tr. 1071).  Plaintiff reported that he failed to show up to work and was not currently working.  (Tr. 1071).  Plaintiff had no physical complaints and denied being in any pain.  (Tr. 1071).  Plaintiff indicated that he recently ended a relationship with a woman who seemed to be a negative influence on him and he wanted to stop drinking.   (Tr. 1071).   Plaintiff suggested that he could stop drinking and cannabis use on his own and declined Substance Abuse Rehab Therapy Program ("SARRTP").   (Tr. 1071).   Dr. opined that depression was present without any evidence of significant anxiety and Plaintiff's insight and judgement were fair with regards to his illness and treatment-related decision making.  (Tr. 1072).  Dr. Rjepaj advised Plaintiff to abstain from alcohol and referred him for outpatient substance abuse treatment.  (Tr. 1070).

On March 11, 2014, Plaintiff underwent a substance abuse consultation and indicated that he wanted to begin group counseling in a week.  (Tr. 1067).

### 3.    VA Compensation and Pension (C&P) evaluations of PTSD: James Bashai, Ph.D.; Lawrence Von Rago, M.D.

On August 1, 2007, Plaintiff underwent a C&P evaluation[3] for post-traumatic stress disorder.  (Tr. 565).  In review of Plaintiff's medical history, Dr.

---

[3] "Compensations and pension examinations are not for the purposes of treatment."  *McCleary v. Colvin*, No. 115CV00172JEJGBC, 2016 WL 791581, at *13 n.7 (M.D. Pa. Mar. 1, 2016); *See*

Bashai noted that Plaintiff did not have any significant medical history prior to or after an injury that he suffered while parachute jumping at in January 2002.  (Tr. 565).  Dr. Bashai noted that Plaintiff's "MRI revealed evidence of left paracentral disc herniation extending into the left forearm and 14-5 extending at the left extraforaminal aread."  (Tr. 565).  Plaintiff reported that he was unable to lift things when they are low to the ground and that he experiences exacerbations in symptoms every few months with his back.  (Tr. 565).

Dr. Bashai noted that it was "not clear whether [Plaintiff] was suffering from an Adjustment Disorder, with mixed depression and anxiety or from a mild form of PTSD."  (Tr. 566).  Plaintiff reported that he was worried about his job at a real estate company because he has little patience with his customers.  (Tr. 566). Plaintiff reported experiencing suicidal ideation in the past, but denied any at the present time.  (Tr. 566).  Plaintiff reported that he disliked dealing with people. (Tr. 566).  Dr. Bashai noted that Plaintiff lacked a positive emotional engagement in his life, was likely to withdraw from others, and to be passive in social relations. (Tr. 566).   Plaintiff reported that he did not have the energy to deal effectively with the demands of his daily life, has a hard time deciding what to do, and has

---

*e.g.,* 38 C.F.R. § 60.2 ("Compensation and pension examination means an examination requested by VA's Veterans Benefits Administration to be conducted at a VA health care facility for the purpose of evaluating a veteran's claim"); *Walker v. Shinseki,* No. 12–2367, 2013 WL 4431075, at *4 (Vet. App. Aug. 19, 2013) (upholding decision which distinguished between statements for the purposes of treatment versus statements made during a compensation and pension examination).

strong anger problems which interfere with his daily functioning.  (Tr. 566).

Plaintiff reported that occasionally he has an urge to do something harmful to

others as has happened when he collided his car with his wife's car after an angry

argument.  (Tr. 566).    Dr. Bashai stated that Plaintiff's account of symptoms

"would suggest that he is suffering from either an Adjustment Disorder, with

anxiety and depression or from a Depressive Disorder, NOS" and that he also

raises the possibility of PTSD symptoms  (Tr. 566).    With regards to PTSD

symptoms, Plaintiff reported experiencing frequent flashbacks, being detached

from family and friends, problems with sleep, irritability and anger outbursts.  (Tr.

566-67).  Plaintiff reported experiencing strong hypervigilance and startle response

to sudden loud noises such as a garbage truck or car backfire.  (Tr. 567).  Upon

evaluation Dr. Bashai observed that Plaintiff:

> is alert and oriented to person, time and place. He comes across as
> short tempered and ready to explode. . . . He reports feelings of
> depression, and his high score on the BDI-2 is 37 which indicates
> severe depression. He admitted to a history of suicidal thoughts. He
> denies any attempts, and he has contracted for safety with his
> [therapist]. He does not show any thought disorder, his thinking is
> linear and free from delusions. He is not suffering from cognitive
> deficits since he passed the MMSE readily. His attention, registration,
> abstraction and problem solving are adequate. His insight into his
> condition is not adequate. His judgment is also poor. He is competent
> to handle his finances.

(Tr. 567).  Dr. Bashai opined that while Plaintiff's "validity indicators in terms of

VRIN  are  acceptable,"  there  was  "additional  evidence  of  inconsistency  in

presenting himself as more pathologic than he is." (Tr. 566). Dr. Bashai continued

that Plaintiff's:

> clinical scales are all above 80 and his profile elevation of 88.5 is a
> cry for help. . . . But the fact that PT is 98, higher than Sc indicates
> that this profile is made by an angry man rather than a psychotic man.
> . . . A sense of malaise, demoralization and physical ailments
> permeate the entire profile. There is [evidence] of a mild PTSD with a
> strong Depression component. There is no [evidence] of a personality
> disorder.

(Tr. 567-68). Dr. Bashai diagnosed Plaintiff with mild Post-traumatic Stress

Disorder, with strong Depression and assessed Plaintiff with a GAF score of 65.

(Tr. 568).

In a C&P examination note dated January 18, 2012, it was noted that a

review of Plaintiff's records was requested to determine the extent of Plaintiff's

compensation and eligibility for service connected disability and "individual

unemployability." (Tr. 980). Dr. Von Rago noted that Plaintiff did not "appear to

be at high risk in terms of acting out" and that Plaintiff felt improvement with

treatment although he continued to have intermittent passive suicidal thinking. (Tr.

980-81). Dr. Von Rago noted that Plaintiff has never been psychiatrically

hospitalized. (Tr. 981). Plaintiff reported that he misused alcohol in the past,

however, he quit around February 2008. (Tr. 981). Dr. Von Rago opined that

Plaintiff did not appear to meet full criteria for alcohol dependence or abuse. (Tr.

981). Plaintiff reported that he continued to work part-time as a real estate agent,

however, business was slow and he felt that his medication-related fatigue detracted from his ability to work.  (Tr. 981).

Plaintiff reported that he typically may work from 9:00 to 12:00 there taking calls, and when he is not working, he may spend time with his girlfriend of six months.  (Tr. 981).  Plaintiff reported that he and his girlfriend do things like cook together, see movies, and socialize with each other.  (Tr. 981).  Plaintiff reported that he did not socialize much in terms of outside friendships, but he has close relations with family members and he and his girlfriend will visit her family as well his own family periodically.  (Tr. 981).  Plaintiff reported having no hobbies and that he generally spends time at home.  (Tr. 981).  Plaintiff reported that he does not have any "real friends," just some acquaintances with whom he will do things occasionally, and he tries to stay away from dealing with people or crowds.  (Tr. 981).  Plaintiff reported no major stressors except for excessive fatigue.  (Tt. 981).  Plaintiff reported that he periodically experiences nightmares, hypervigilant symptoms, and that he continued to be very irritable and has to put forth a lot of effort to not act out on his anger.  (Tr. 981-82).

Dr. Von Rago concluded that Plaintiff continued to exhibit post traumatic stress problems, that he has "some episodic panic type of symptoms but does not meet criteria for panic disorder," and "has some OCD symptoms but mostly these appear to be related to personality traits and/or his difficulties with short-term

memory."  (Tr. 982).  Dr. Von Rago noted that Plaintiff did not appear to be exhibit symptoms of a generalized anxiety disorder and did not have mania or hypomanic symptoms.  (Tr. 982).  Plaintiff reported feeling depressed on and off, but not daily and Dr. Von Rago opined that it appeared that most of the mood symptoms are related to PTSD.  (Tr. 982).

Dr. Von Rago opined that Plaintiff did not have any impulse control problems at the time of the examination, but that "he has to fight this quite a bit" and that the impulse problems seemed related to Plaintiff's PTSD more than other things but could be provoked by alcohol use.  (Tr. 982).  Dr. Von Rago opined that there was no evidence of any major concentration or memory disturbances and that Plaintiff's Judgment and insight was "pretty good."  (Tr. 982).  Dr. Von Rago assessed Plaintiff with a GAF score of 61 to 70.  (Tr. 983).  Dr. Von Rago concluded that Plaintiff:

> does not appear to be unemployable from a psychiatric perspective. He is presently working. The patient does have significant medical issues, which were not addressed, but in reference to the likelihood of being capable of working from a psychiatric perspective only and not taking into account any other factor, I do not see evidence to suggest that he would be incapable of all types of unemployment, etc.

(Tr. 982).

///

///

///

### 4.  VA Compensation and Pension (C&P) evaluation of Lower Back: Clagett Wolfe, M.D.

On July 30, 2007, Plaintiff underwent a C&P evaluation[4] of his lower back by his primary care physician, Dr. Wolfe. (Tr. 568-71). Plaintiff reported experiencing a gradual worsening of his lower back pain and no other medical problems other than the lower back pain. (Tr. 569). Plaintiff took "Naproxen 500 mg one pill po twice a day . . . for his lower back pain, which causes the side effect of forgetfulness" and "provides a minimal response." (Tr. 569). Plaintiff reported that his lower back pain, started with a parachute accident while in the military in 1990 and after he went to Iraq, the pain worsened from having to wear heavy equipment. (Tr. 569). Plaintiff reported that although previously his pain had been intermittent, over the past fourteen to fifteen months, his lower back pain has been constant. (Tr. 569). Plaintiff describes experiencing weakness, stiffness, fatigability, and lack of endurance. (Tr. 569).

Plaintiff reported no radiation into the legs, but he feels a constant pressure in his left lower back. (Tr. 569). Plaintiff reported experiencing a baseline lower back pain of six to seven out of ten with flare-ups worsening to nine out of ten.

---

[4] "Compensations and pension examinations are not for the purposes of treatment." *McCleary v. Colvin,* No. 115CV00172JEJGBC, 2016 WL 791581, at *13 n.7 (M.D. Pa. Mar. 1, 2016); *See e.g.,* 38 C.F.R. § 60.2 ("Compensation and pension examination means an examination requested by VA's Veterans Benefits Administration to be conducted at a VA health care facility for the purpose of evaluating a veteran's claim"); *Walker v. Shinseki,* No. 12–2367, 2013 WL 4431075, at *4 (Vet. App. Aug. 19, 2013) (upholding decision which distinguished between statements for the purposes of treatment versus statements made during a compensation and pension examination).

(Tr. 569).   According to Plaintiff, flare ups occur about once every other day, lasting a few hours and symptoms are exacerbated by prolonged sitting, standing, or walking, as well as with prolonged repeated lower back movement and increased back activity.  (Tr. 569).  Plaintiff reported that flare-ups are alleviated with Naproxen, stretching his back, and changing positions.  (Tr. 569).  When Plaintiff experiences lower back pain flare-ups they result in severe additional limitation in motion of the back.  (Tr. 569).  Plaintiff reported that over the past 12 months, he once had to have a day of bed rest due to the severity of the flare-up. (Tr. 569).

Plaintiff reported using a cane for his lower back and denied the use of crutches, braces, or other assistive devices other than the cane.  (Tr. 569).  Plaintiff reported that his back pain prevented him from continuing work as a carpenter so he works as a real estate agent.  (Tr. 569).  Plaintiff reported that due to his back pain, he can no longer do some of the chores that he used to do such as snow removal.  (Tr. 569).

Dr. Wolfe observed that Plaintiff's posture and gait were normal, he exhibited normal strength and sensation in all four extremities, he had 2+ patellar, Achilles, biceps, triceps, or brachial radialus reflexes bilaterally, and normal range of motion, all major joints, all four extremities. (Tr. 570-71).  Dr. Wolfe observed

that Plaintiff demonstrated a normal range of motion of the neck and a limited range of motion of the lumbosacral spine.

Upon examination of Plaintiff's lumbosacral spine, Dr. Wolfe noted "objective evidence of painful motion, as [Plaintiff] grimaced with some of his lower back pain range of motion testing."  (Tr. 571).  Dr. Wolfe observed "some paravertebral spasm noted in the lower lumbosacral region" and "[m]ild to moderate tenderness in the lumbosacral region with less significant tenderness just left of the lumbosacral spine."  (Tr. 571).  Dr. Wolfe noted that there was not any back weakness, postural abnormalities, or fixed deformities.  (Tr. 571).  Dr. Wolfe observed that the musculature of Plaintiff's back was normal and that Plaintiff demonstrated normal strength and sensation in the bilateral lower extremities and 2+ patellar and Achilles reflexes bilaterally.  (Tr. 571).  Plaintiff had negative straight leg raises bilaterally and no muscle atrophy.  (Tr. 571).  Dr. Wolfe noted that Plaintiff had good muscle tone of the bilateral lower extremities.  (Tr. 571). The lumbosacral x-ray done that day "showed mild L5-Sl degenerative disc disease" and the MRI of the lumbosacral spine done May 23, 2007, showed "degenerative disc disease at L5/Sl, grade I retrolisthesis and small left foraminal protrusion causing foraminal narrowing at the level; multi level disc dessication, most prominent at L5/Sl."  (Tr. 572).  Dr. Wolfe diagnosed Plaintiff with "degenerative disc disease, L5/Sl with grade I retrolisthesis and small left

foraminal protrusion with foraminal narrowing at L5/Sl level" and opined that Plaintiff's:

> lower back condition has a severe effect on [Plaintiff's] ability to perform his occupational duties as he can no longer work in construction, has had to change jobs to real estate agent, primarily due to heavy lifting, prolonged position holding, and frequent back activity. [Plaintiff's] lower back condition has had a severe effect on his ability to perform his usual daily activities as he can no longer do some of the household chores that he used to do, such as snow removal.

(Tr. 572).

### 5.      VA C&P Evaluation of TBI: William Carlson, M.S., PA-C

On August 10, 2011, Plaintiff underwent a C&P evaluation for his TBI. (Tr. 838-42). Mr. Carlson concluded that Plaintiff's condition: 1) was mild and stable; 2) did not cause incapacitating headaches; 3) did not have an effect on usual occupation or resulted in work problems, and; 4) did not present a problem with usual daily activities. (Tr. 839, 842). Mr. Carlson noted that although Plaintiff reported mild memory loss, such was without any "objective evidence on testing." (Tr. 841). Mr. Carlson opined that Plaintiff's judgement was normal and that his conditions were "possibly more related to reported [mental health] issues rather [than TBI]," however, he was unable to "quantify with any degree of certainty." (Tr. 841).

In a C&P examination note dated January 18, 2012, it was noted that a review of Plaintiff's records was requested to determine the extent of Plaintiff's

compensation and eligibility for service connected disability and "individual unemployability."[5]  (Tr. 979).  Mr. Carlson summarize that Plaintiff's TBI was stable and without any interval change and without any cognitive or physical deficits identified on exam.  (Tr. 979).  Mr. Carlson noted that Plaintiff's sleep apnea was treated effectively with a CPAP and that Plaintiff and his mental health providers attribute Plaintiff's sleepiness is due to his psychiatric medications.  (Tr. 979).  Mr. Carlson opined that Plaintiff did not have any difficulty with driving and his back condition had been stable since his previous C&P examination in September 2011.  (Tr. 979).  Mr. Carlson also noted that Plaintiff works in real estate, however, Plaintiff reported that business was 'real bad' and Mr. Carlson opined that Plaintiff's "service connected conditions [were] not having adverse effects on occupation or his ability to secure and maintain gainful employment." (Tr. 980).

---

[5] "Individual Employability" ("IU") is also known as Total Disability based on Individual Unemployability ("TDIU"), which is a form of VA compensation in stances where the veteran has a "scheduler rating less than [100%]," but is "unable to secure or follow a substantially gainful occupation as a result of service–connected disabilities."  38 C.F.R. § 4.16, *see McCleary v. Colvin*, No. 1:15-CV-172, 2016 WL 6871375, at *1 (M.D. Pa. Mar. 1, 2016).  In this instance the Court notes that while it appears from this record that Plaintiff was considered for Individual Unemployability, and there is no rating decision included in the record which would explain whether or not he was determined to be eligible for IU.  *See McCleary v. Colvin*, No. 1:15-CV-172, 2016 WL 6871375, at *1 (M.D. Pa. Mar. 1, 2016) (noting that Finally, Plaintiff's VA disability rating did "not support a finding that Plaintiff [was] unable to work given that he applied for TDIU and his claim was rejected").  Additionally, the Court notes that a January 2012 C&P examination noted that a review of Plaintiff's records was requested to determine the extent of Plaintiff's compensation and eligibility for service connected disability and "individual unemployability."  The record does show a VA disability rating decision dated March 21, 2011, which summarized Plaintiff's 90 percent disability rating (Tr. 519-20), there does not appear to be a VA disability rating discussing addressing Plaintiff's "individual employability" claim.

### 6.      VA C&P Evaluation of Chronic Fatigue Syndrome: Clagett Wolfe, M.D.

On August 10, 2011, Plaintiff underwent a C&P evaluation and Dr. Wolfe opined that Plaintiff had chronic fatigue syndrome.  (Tr. 833-37).  Dr. Wolfe opined that Plaintiff's fatigue has been severe enough for the past six years to produce impaired average daily activity to about 33 percent from pre-illness activity level.  (Tr. 837).

### 7.      VA Compensation and Pension (C&P) evaluation of Hearing Loss and Tinnitis: Teresa Wallace, Aud.

On August 23, 2011, Plaintiff underwent a C&P evaluation for his hearing loss and tinnitus.  (Tr. 823-31).  Plaintiff reported that the tinnitus affects his sleep and concentration and it was noted that the tinnitus had no effect on employability.  (Tr. 831).  Audiologist, Ms. Wallace concluded that Plaintiff's mild hearing loss did not "impact ordinary conditions of daily life, including ability to work."  (Tr. 829).

### 8.      VA Compensation and Pension (C&P) evaluation of Lower Back: Clagett Wolfe, M.D.

On October 3, 2011, Plaintiff underwent a C&P evaluation for his back.  (Tr. 799-811).  Plaintiff reported that flare-ups of his condition made him intolerant of excessive, repetitive, or prolonged activity involving his back and intolerant of heavy lifting, prolonged standing, and prolonged walking.  (Tr. 800).  Dr. Clagett indicated that Plaintiff's range of motion as: 1) where 90 degrees is normal,

forward flexion of 25 degrees, painful forward flexion of 5 degrees, and post-repetition test forward flexion of ten degrees; 2) where 30 degrees is normal, extension and painful extension of 5 degrees, and post-repetition test extension of 10 degrees; 3) where 30 degrees is normal, right and left lateral flexion of 10 degrees, painful right and left lateral flexion of 10 degrees, and post-repetition test left lateral flexion of 10 degrees and right lateral flexion of 5 degrees; 4) where normal is 30 degrees, right and left lateral rotation, painful right and left lateral rotation, and post-repetition test right and left lateral rotation of 15 degrees.  (Tr. 801-02).  Dr. Clagett observed that Plaintiff demonstrated tenderness with muscle spasm in central lower lumbosacral spine region, however, Plaintiff's muscle spasm was not severe enough to result in an abnormal gait; abnormal spinal contour, such as scoliosis, reversed lordosis, or abnormal kyphosis, or; guarding and/or muscle spasm is present, but do not result in abnormal gait or spinal contour.  (Tr. 803).  Dr. Clagett observed that Plaintiff's deep tendon reflexes were normal for his knees and ankles, that he had negative bilateral straight leg raise test results, and moderate radiculopathy in the lower left extremity involving the sciatic nerve.  (Tr. 804-06).  Dr. Clagett noted that Plaintiff did not use any assistive devices to assist mobility.  (Tr. 807).  Dr. Clagett summarized x-ray, CT scan, and MRI findings of Plaintiff's thoracolumbar spine.  (Tr. 809).  Dr. Clagett concluded

that Plaintiff's back symptoms adversely impacts his ability to work and detailing

that Plaintiff was:

> Intolerant of excessive, repetitive, or prolonged activity of the lumbosacral spine; intolerant of prolonged inactivity of the lumbosacral spine; intolerant of heavy lifting; intolerant of prolonged sitting, standing, and walking; and veteran must make frequent visits to medical providers and medical facilities for management of his lumbosacral spine condition.

(Tr. 809-10).  Dr. Clagett diagnosed Plaintiff with: 1) lumbosacral spine

degenerative disc disease; 2) lumbosacral spine degenerative joint disease; 3)

lumbosacral spinal stenosis, and; 4) recurrent lumbosacral strain.  (Tr. 810).

### 9.  VA Compensation and Pension (C&P) evaluation of Bilateral Carpal Tunnel Syndrome: Katherine Mulligan, M.D.

On December 21, 2012, Plaintiff underwent a C&P evaluation of his

peripheral nerves.  (Tr. 1102-1115).  Dr. Mulligan noted that Plaintiff did not use

any assistive devices as a normal mode of locomotion.  (Tr. 1110).  Dr. Mulligan

opined that Plaintiff's peripheral nerve condition and/or peripheral neuropathy did

not impact his ability to work and added that it "would not prohibit physical, nor

sedentary gainful employment."  (Tr. 1111-1112).

### 10. Mental RFC Assessment: Mitchell Sadar, Ph.D.

On February 27, 2008, Dr. Sadar opined that Plaintiff was not significantly

limited in his ability to: 1) remember locations and work-like procedures; 2)

understand and remember very short and simple instructions; 3) understand and

remember detailed instructions; 4) carry out very short and simple instructions; 5) carry out detailed instructions; 6) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 7) sustain an ordinary routine without special supervision; 8) make simple work-related decisions; 9) ask simple questions or request assistance; 10) accept instructions and respond appropriately to criticism from supervisors; 11) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; 12) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; 13) respond appropriately to changes in the work setting; 14) be aware of normal hazards and take appropriate precautions; and, 15) travel in unfamiliar places or use public transportation.  (Tr. 602-03).  Dr. Sadar opined that Plaintiff was moderately limited in his ability to: 1) maintain attention and concentration for extended periods; 2) work in coordination with or proximity to others without being distracted by them; 3) maintain attention and concentration for extended periods; 4) work in coordination with or proximity to others without being distracted by them; 5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 6) interact appropriately with the general public, and; 7) set realistic goals or make plans independently of others.  (Tr. 602-03).

Dr. Sadar summarized Plaintiff's allegations and noted that Plaintiff had received mental health evaluation and treatment at the VA, his medical records "indicate the presence of a mild PTSD, with a 'strong Depression', when assessed in August, 2007. More recent entries mention PTSD, and an adjustment disorder with depressed mood." (Tr. 604). Dr. Sadar noted that Plaintiff had not been hospitalized due to his mental impairment. (Tr. 604). Dr. Sadar opined that although Plaintiff had some limitations, he still had "the mental RFC for basic, routine work." (Tr. 604). Dr. Sadar opined that Plaintiff was mildly restricted in his ADLs, had moderate difficulty in maintaining social functioning, and had moderate difficulty in maintaining concentration, persistence, and pace. (Tr. 616). Dr. Sadar opined that Plaintiff did not experience any episodes of decompensation of extended duration. (Tr. 616). Dr. Sadar continued stating that Plaintiff's basic memory processes were intact, he could make simple decisions, he was able to carry out very short and simple instructions, he could be expected to complete a normal workday without exacerbation of psychological symptoms, his ADL's and social skills were functional, he could sustain an ordinary routine without special supervision, he could function in production oriented jobs requiring little independent decision making, and that Plaintiff's limitations resulting from the impairment do not preclude the Plaintiff from performing the basic mental demands of competitive work on a sustained basis. (Tr. 604, 616).

On April 6, 2011, Dr. Sadar completed an additional psychiatric review technique. (Tr. 135-136, 139-42). Dr. Sadar opined that Plaintiff had: 1) a mild restriction of activities of daily living; 2) moderate difficulties in maintaining social functioning; 3) moderate difficulties in maintaining concentration, persistence or pace, and; 4) no repeated episodes of decompensation, each of extended duration. (Tr. 136). Dr. Sadar opined that Plaintiff did not meet the criteria for Listing 12.04 or Listing 12.06. (Tr. 136). Dr. Sadar opined that Plaintiff had limitations in social interactions, limitations in having sustained concentration and persistence, and adaptation, but did not have understanding and memory limitations. (Tr. 139). Dr. Sadar opined that Plaintiff was not significantly limited in his ability to: 1) carry out very short and simple instructions; 2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 3) sustain an ordinary routine without special supervision; 4) work in coordination with or in proximity to others without being distracted by them; 5) make simple work-related decisions; 6) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 7) ask simple questions or request assistance; 8) accept instructions and respond appropriately to criticism from supervisors; 9) get along with coworkers or peers without distracting them or

exhibiting behavioral extremes; 10) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; 11) be aware of normal hazards and take appropriate precautions; 12) travel in unfamiliar places or use public transportation, and; 13) set realistic goals or make plans independently of others. (Tr. 139-40).

Dr. Sadar opined that Plaintiff was moderately limited in his ability to: 1) carry out detailed instructions; 2) maintain attention and concentration for extended periods; 3) interact appropriately with the general public, and; 4) respond appropriately to changes in the work setting.  (Tr. 139-40).  In support of his opinion, Dr. Sadar explained:

> [Plaintiff] is 42 years old. [Plaintiff] has completed 13 years of education. [Plaintiff] has had no mental health related hospitalizations. The medical evidence indicates the presence of the medically determinable impairments of PTSD, Major Depressive Disorder. Records from the VA indicate a diagnosis of "PTSD, mild, with strong depression" in 2007. He was treated since then with a prescription for Lorazepam In March, 2011 he was seen by a VA psychiatrist who added the diagnosis of Major depressive disorder An antidepressant medication was prescribed. [Plaintiff] denied an offer for psychotherapy. The MSE at that time found a neutral mood with congruent affect, and intact basic, cognitive functions. This claimant has some limitations, but has the mental RFC for basic, routine work. [Plaintiff] would be expected to understand and remember one and two step instructions. [Plaintiff's] basic memory processes are intact and he is able to perform simple, routine, repetitive work. [Plaintiff] can make simple decisions, and would be expected to complete a normal workday without an exacerbation of mental health symptoms. [Plaintiff] is able to maintain socially appropriate behavior and maintain an acceptable level of personal hygiene.  [Plaintiff] can sustain an ordinary routine without special supervision, and would be

expected to function in a job requiring little independent decision making.

Review of the medical evidence reveals that [Plaintiff] retains the abilities to manage the mental demands of many types of jobs not requiring complicated tasks. The limitations resulting from the impairment do not preclude [Plaintiff] from performing the basic mental demands of competitive work on a sustained basis.

. . . [Plaintiff] is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his . . . impairments.

(Tr. 140)

### 11. Consultative Examination: Christine Daecher, D.O.

On March 23, 2011, Plaintiff underwent a consultative examination with Dr. Daecher.  (Tr. 677-84).  Plaintiff reported that he experienced back pain in his lumbar spine which radiates down the left leg to a few inches about the knee.  (Tr. 677).  Plaintiff reported that his symptoms are alleviated by stretching the legs up into his chest and are exacerbated by sitting over twenty minutes or standing over 20 minutes.  (Tr. 677).  Plaintiff tried traction, heat, medication and physical therapy but the physical therapy caused a lot of pain.  (Tr. 677).  According to Plaintiff, he was told that there was a rupture of in the L4-L5 region of his spine and that he had a CT scan of his lumbar about a week ago.  (Tr. 677).  Plaintiff also stated that in 2002 he was told he needed surgery but he did not want this.  (Tr. 677).  According to Plaintiff, he experienced back pain for many years which worsened when he went to Iraq in 2005.  (Tr. 677).  Plaintiff reported that he

experiences pain radiating into the left leg when driving in a car for over an hour and walking around 500 feet.  (Tr. 677).

Upon examination, Dr. Daecher noted that: 1) Plaintiff's lower and upper extremities presented unremarkable findings; 2) decreased extension in the cervical spine; 3) decreased flexion of lumbar spine; 4) normal straight leg raise seated and supine; 5) all five Waddell's signs negative; 6) normal gait and station; 7) Plaintiff was able to get on and off the exam table, and up-and-down from chairs with ease, able to maneuver around the office easily; 8) Plaintiff exhibited no difficulties lying down and then sitting up, getting on and off the scale, no difficulties getting shoes on and off and was able to squat down then stand back up without difficulty. (Tr. 679).  Dr. Daecher also observed that: 1) Plaintiff's deep tendon reflexes were intact, overall; 2) where reflexes are evaluated on a scale of 0-4 with 2+ being normal, Plaintiff's reflexes were 2 for the patella and 1 for the Achilles; 3) Plaintiff did not exhibit any ataxia or unsteadiness; 4) Plaintiff's heel and toe walking was normal; and, 5) Plaintiff's gross and fine motor movements were normal.  (Tr. 679).  Dr. Daecher concluded that it was:

> not clear what the treatments were that [Plaintiff] had or if they were appropriate as traction has fallen into and out of favor and studies do not show this as being beneficial. He has a long history of low back pain with worsening over the years.  There is clear damage at the L5-S1 disc as seen on an MRI in 2007. He is able to maneuver well, walk on toes and heels without problem but will likely have some degree of chronic back pain. It is not clear that he is not a surgical candidate. He

has not had many treatments for his back and may benefit from medication as well as injections, weight loss and (physical therapy).

(Tr. 679-80).   Dr. Daecher also observed that Plaintiff was "very nervous and depressed while in the appointment."  (Tr. 680).   Dr. Daecher attached a form where she checked boxes indicating that Plaintiff: 1) was capable of occasionally lifting and carrying up to 25 pounds and rarely lifting and carrying 50 pounds; 2) had no limitation in standing and walking; 3) could stand and walk five to six hours in an eight-hour day; 4) could sit four to five hours, however short increments was preferred; 5) no limitation in pushing and pulling; 6) could occasionally bend, kneel, stoop, crouch, balance, and climb; 7) had no fine or gross motor limitations, and; 8) had no environmental restrictions .  (Tr. 681-82).   In an attached range of motion chart, Dr. Daecher indicated that Plaintiff had full range of motion in his shoulders, elbows, wrists, knees, ankles, and hips.  (Tr. 683-84). Dr. Daecher also indicated that Plaintiff had full flexion and full left and right lateral flexion and rotation of the cervical spine.  (Tr. 684).  Plaintiff had reduced extension of the cervical spine of 10 degrees out of 30 degrees and reduced lumbar flexion-extension of 80 degrees out of 90 degrees.  (Tr. 684).  Plaintiff had full left and right lateral flexion of his lumbar spine.  (Tr. 684).

### 12. Pennsylvania Department of Corrections, Mercer: Sonja Schaffer, M.D., Deborah Gosnell, N.P., M.J. Edwards, R.N.

In a record dated May 5, 2008, Plaintiff reported that he had a chronic condition of depression and low back pain.  In a medical release summary dated, April 28, 2009, Ms. Edwards opined that Plaintiff should not engage in weight lifting, could do passive sports, and did not have any employment or housing limitations.  (Tr. 1059).

On June 19, 2009, Plaintiff reported that the Naprosyn was not working and he was experiencing pain radiating down to his left buttock.  (Tr. 1055).  Plaintiff reported having a long history of pain from an old injury.  (Tr. 1055).  Ms. Gosness observed that Plaintiff's range of motion was within normal limits, tenderness upon palpation in left lumbar region which radiated into the left buttock, and a negative SLR.  (Tr. 1055).

In a record dated October 13, 2009, Dr. Schaffer interpreted images of Plaintiff's right knee and opined that there was not any evidence of fracture or other recent acute traumatic osseous or joint pathology.  (Tr. 1047).  On a diagnostic stamp at the bottom of the page, the practitioner indicated that the findings were not clinically significant.  (Tr. 1047).

In a record dated November 3, 2009, Dr. Schaffer interpreted images of Plaintiff's lumbar spine and opined that there was "mild diffuse hypertrophic spurring," "early degenerative disc disease at L5-S1," normal transverse processes, normal SI joints, and intact paraspinal soft tissues.  (Tr. 1046).  Dr. Schaffer added

that Plaintiff had possible mild disc space narrowing at L5-S1.  (Tr. 1046).  On a diagnostic stamp at the bottom of the page, the practitioner indicated that the findings were not clinically significant.  (Tr. 1046).

### 13. Sleep Disorder Associates: Nell Line, D.O.

In a report dated October 20, 2011, Dr. Kline interpreted a sleep study and concluded that Plaintiff demonstrated mild obstructive sleep apnea.  (Tr. 930).

### III.   Legal Standards and Plaintiff's Alleged Errors

To receive benefits under the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).  The Act requires that a claimant for disability benefits show that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).  The ALJ uses a five-step evaluation process to determine if a person is eligible for disability benefits.  *See* 20 C.F.R. § 404.1520. The ALJ must sequentially determine: 1) whether the

claimant is engaged in substantial gainful activity; 2) whether the claimant has a severe impairment; 3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); 4) whether the claimant's impairment prevents the claimant from doing past relevant work; and 5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520. Before step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that the claimant can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability under the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

With due deference to the Commissioner's interpretation of social security rulings and regulations, the court may reverse the Commissioner's final determination if the ALJ did not properly apply the legal standards. *See* 42 U.S.C. § 405(g) ("court shall review only the question of conformity with such regulations and the validity of such regulations"); *Christopher v. SmithKline Beecham Corp.*,

132 S. Ct. 2156, 2166-67 (2012) (deference to agency interpretation of its own regulations); *Sanfilippo v. Barnhart*, 325 F.3d 391, 393 (3d Cir. 2003) (plenary review of legal questions in social security cases); *see also Witkowski v. Colvin*, 999 F. Supp. 2d 764, 772-73 (M.D. Pa. 2014) (citing *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 91 (3d Cir. 2007)).  The court may also reverse the Commissioner if substantial evidence does not support the ALJ's decision.  *See* 42 U.S.C. § 405(g); *see also Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir.1986).  Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## A. Limited Weight to VA Disability Rating

Plaintiff argues that the ALJ committed reversible error by assigning limited weight to the VA disability rating.  Pl. Brief at 14, 19-21.  In previous cases, the

undersigned has discussed the significant differences between VA disability rating decisions and SSA disability determinations, the probative value of VA disability rating decisions, and the issue of weight an ALJ should allocate to VA disability rating decisions. *McCleary v. Colvin*, No. 1:15-CV-172, 2016 WL 6871375, *passim* (M.D. Pa. Mar. 1, 2016); *Durden v. Colvin*, No. 1:15-CV-0118, 2016 WL 827078, *passim* (M.D. Pa. Mar. 3, 2016). The VA rating decision "is authored by an individual 'unqualified' to make medical conclusions and is 'essentially a form opinion, unaccompanied by any written report.'" *Durden v. Colvin*, No. 1:15-CV-0118, 2016 WL 827078, at *1 (M.D. Pa. Mar. 3, 2016) (internal citations omitted). Since issuing *McCleary* and *Durden*, the SSA issued "Revisions to Rules Regarding the Evaluation of Medical Evidence," stating:

> There are four reasons why we should not need to consider or articulate in our written determinations or decisions our consideration of decisions from other governmental and nongovernmental agencies. . . .
>
> For example, VA and SSA disability differ significantly in purpose as well as in eligibility criteria. In determining disability, the VA assigns a percentage disability rating based on a consideration of the effects of a disease or injury on a hypothetical, average person's ability to earn income without consideration of a specific veteran's age, education, or work experience. In contrast, under our rules, unless a claimant's impairment(s) meets or medically equals a listing, we perform an individualized assessment that focuses on that particular claimant's ability to perform work in the national economy.
>
> . . . Thus, because of our different requirements, the mere fact that the VA process resulted in a particular disability rating is not predictive or

useful evidence of whether the claimant will be found disabled under
our rules, even upon consideration of the same impairment(s).

. . . Third, our adjudicators follow regulations and other guidance
specific to our program; they generally do not have a detailed
understanding of the rules other agencies or entities apply when
making their decisions. Consequently, our adjudicators lack the
expertise to compare and contrast the differences between the Act and
our rules, and the rules applied by another agency or entity.
Accordingly, when our adjudicators follow our instructions in SSR
06-03p that require them to consider decisions in the record from
another agency or entity in the record, they often simply state that
they considered the other agency's or entity's decision, but that it was
not binding because it was made using the other agency's or entity's
rules and not ours. . . .

81 FR 62560-01, 2016 WL 4702272 at *62564-65 (September 9, 2016).   The

above excerpt recognizes the significant differences between the VA and SSA

disability systems and the lack of probative value of VA rating decisions for an

ALJ's determination of disability within the SSA regulatory requirements.   *Id.*   The

undersigned finds the SSA's discussion on the matter pertinent.   *See North Haven*

*Board of Education v. Bell,* 456 U.S. 512, 535, 102 S.Ct. 1912, 72 L.Ed.2d 299

(1982) ("Although postenactment developments cannot be accorded 'the weight of

contemporary legislative history, we would be remiss if we ignored these

authoritative expressions'") (quoting *Cannon v. Univ. of Chi.,* 441 U.S. 677, 686 n.

7 (1979)).

Review of the record supports the ALJ's allocation of weight to the VA

rating decision.   January 2012 C&P examinations noted that a review of Plaintiff's

records were requested to determine the extent of Plaintiff's eligibility for "individual unemployability." (Tr. 979-80). In a C&P examination dated January 18, 2012, Dr. Von Rago concluded that Plaintiff:

> does not appear to be unemployable from a psychiatric perspective. He is presently working. The patient does have significant medical issues, which were not addressed, but in reference to the likelihood of being capable of working from a psychiatric perspective only and not taking into account any other factor, I do not see evidence to suggest that he would be incapable of all types of unemployment, etc.

(Tr. 982). In a C&P examination dated January 18, 2012, Mr. Carlson summarize that Plaintiff's TBI was stable and without any interval change and without any cognitive or physical deficits identified. (Tr. 979). Mr. Carlson noted that Plaintiff's sleep apnea was treated effectively with a CPAP. (Tr. 979). Mr. Carlson opined that Plaintiff did not have any difficulty with driving and his back condition had been stable since his previous C&P examination in September 2011. (Tr. 979). Mr. Carlson also noted that Plaintiff worked in real estate, however, Plaintiff reported that business was 'real bad' and Mr. Carlson opined that Plaintiff's "service connected conditions[6] [were] not having adverse effects on occupation or his ability to secure and maintain gainful employment." (Tr. 980). On December 21, 2012, Dr. Mulligan opined that Plaintiff's peripheral nerve condition and/or peripheral neuropathy did not impact his ability to work and

---

[6] Plaintiff's service connected impairments were: chronic fatigue syndrome, tinnitus, TBI, degenerative joint and disc disease of the spine. (Tr. 519).

added that it "would not prohibit physical, nor sedentary gainful employment." (Tr. 1111-1112).

The record clearly indicates that the ALJ considered the VA's determination and gave it appropriate weight due to the fundamental differences in the determination processes between the Social Security Administration and the Department of Veterans Affairs.  (Tr. 27-28); *see Burczyk v. Colvin*, No. CV 15-1421, 2016 WL 3057668, at *3 (W.D. Pa. May 31, 2016); *McCleary v. Colvin*, No. 1:15-CV-172, 2016 WL 6871375, *passim* (M.D. Pa. Mar. 1, 2016); *Durden v. Colvin*, No. 1:15-CV-0118, 2016 WL 827078, *passim* (M.D. Pa. Mar. 3, 2016). The Court finds that the ALJ committed no error in according little weight to the VA rating of 90 percent for physical and psychiatric impairments.  *See McCleary v. Colvin*, No. 1:15-CV-172, 2016 WL 6871375, at *1 (M.D. Pa. Mar. 1, 2016); *Durden v. Colvin*, No. 1:15-CV-0118, 2016 WL 827078 (M.D. Pa. Mar. 3, 2016) (explaining that even with TDIU and 100 percent schedular ratings, "there exist significant differences from SSA disability determination requirements"); *Jenkins v. Astrue*, No. 1:11–CV–23–MP–GRJ, 2012 WL 807487, at *10 n. 26 (N.D.Fla. Feb. 8, 2012) report and recommendation adopted, No. 1:11CV23–MP–GRJ, 2012 WL 807263 (N.D.Fla. Mar. 9, 2012).

## B. RFC and Light Work

Plaintiff argues that "the ALJ's RFC is inconsistent with the definition of

light work" and thus "the most appropriate remedy in this situation is reversal with remand solely for calculation of benefits."  Pl. Brief at 14, 21-24.

Section 404.1567(b) defines:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b). The ALJ concluded that Plaintiff had the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) except that with following limitations: 1) alternate between sitting and standing every one-half hour; 2) lifting and carrying up to twenty-five pounds; 3) occasional squatting, kneeling, stooping, crouching, crawling, and climbing ramps, ladders, stairs, ropes, and scaffolds; 4) precluded from engaging in repetitive use of the upper extremities for fingering and feeling.  (Tr. 22).  The ALJ also concluded that Plaintiff was "capable of understanding, remembering, and carrying out simple instructions, such as those that can be learned within one month, of occasional decision making and judgment, of occasional work setting changes, and of occasional interaction with supervisors, co-workers, and the public.  (Tr. 22).

In addition to the above discussion of the opinions of Dr. Von Rago, Mr. Carlson, and Dr. Mulligan, there is other medical evidence in the record that supports the ALJ's RFC.  In an April 2011 opinion, Dr. Sadar opined that Plaintiff generally had mild restrictions and was moderately limited in his ability to: 1) carry out detailed instructions; 2) maintain attention and concentration for extended periods; 3) interact appropriately with the general public, and; 4) respond appropriately to changes in the work setting.  (Tr. 139-40).  Dr. Sadar concluded that Plaintiff "retains the abilities to manage the mental demands of many types of jobs not requiring complicated tasks. The limitations resulting from the impairment do not preclude [Plaintiff] from performing the basic mental demands of competitive work on a sustained basis."  (Tr. 140).  In March 2011, Dr. Daecher opined that Plaintiff: 1) was capable of occasionally lifting and carrying up to 25 pounds and rarely lifting and carrying 50 pounds; 2) had no limitation in standing and walking; 3) could stand and walk five to six hours in an eight-hour day; 4) could sit four to five hours, however short increments was preferred; 5) had no limitation in pushing and pulling; 6) could occasionally bend, kneel, stoop, crouch, balance, and climb; 7) had no fine or gross motor limitations, and; 8) had no environmental restrictions .  (Tr. 681-82).

According to sections 404.1527(d)(2) and 416.927(d)(2), the final responsibility for deciding a claimant's residual functional capacity is an issue

reserved to the Commissioner.  20 C.F.R. §§ 404.1527, 416.927(d)(2).  "Surveying the medical evidence to craft an RFC is part of the ALJ's duties."  *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006); *see also* 20 C.F.R. §§ 404.1527, 416.927; 20 C.F.R. §§ 404.1545(a), 416.945(a).  Moreover, the ALJ solicited testimony from the vocational expert ("VE") as to whether a person who was capable light work with the above "credibly established" limitations could perform work available in significant numbers in the national economy and the VE testimony does not support the Plaintiff's argument that the "RFC is inconsistent with the definition of light work" and requires a reversal.  *See* Pl. Brief at 14, 21-24; (Tr. 28-29, 62-65) (VE testimony); *see also Mann v. Comm'r Soc. Sec. Admin.*, 638 F. App'x 123, 126 (3d Cir. 2016); *Plummer v. Apfel*, 186 F.3d 422, 431 (3d Cir. 1999).  Plaintiff fails to demonstrate how the ALJ's RFC of light work with the above-enumerated exceptions amounts to a reversible error.

## C. Step Three Non-Severe Impairments

Plaintiff argues that the ALJ erred in finding that Plaintiff's chronic fatigue syndrome, sleep apnea, and tinnitus constituted non-severe impairments.  Pl. Brief at 16.  As support, Plaintiff cites records documenting the mention of Plaintiff's fatigue prior to an October 2011 sleep study which resulted in a diagnosis for obstructive sleep apnea and treatment with a CPAP machine.  Pl. Brief at 17.  Then Plaintiff lists four times between and January 2012 and January 2013 where

Plaintiff complained of fatigue, however, failed to mention that in January 2013, it was noted that Plaintiff's fatigue improved, his CPAP adjusted, and that Ms. Green opined that Plaintiff's fatigue would decrease as he lost more weight. (Tr. 1101). Nor does Plaintiff address that in December 2012, Plaintiff stated that he continued to struggle with fatigue but he also unknowingly takes off his CPAP during the night. (Tr. 1119).

Plaintiff also argues that the ALJ erred in concluding that tinnitus was not a severe impairment. Pl. Brief at 18. However, Plaintiff fails to address the medical records noting that Plaintiff's tinnitus was mild (Tr. 873, 892) or the audiologist's opinion that the tinnitus had no effect on employability. (Tr. 831).

At step two of the five-step sequential inquiry, the ALJ must determine whether the claimant has a medically severe impairment or combination of impairments. *See Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). An impairment is severe only if it significantly limits the claimant's physical or mental ability to do "basic work activities," *i.e.*, physical abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling, or mental activities such as understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b); 416.921(b).

A "severe" impairment is distinguished from "a slight abnormality," which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of the claimant's age, education, or work experience. *See Bowen*, 482 U.S. at 149-51. The claimant has the burden of showing that an impairment is severe. *Bowen*, 482 U.S. at 146 n. 5. Moreover, objective medical diagnoses alone are insufficient to establish severity at step two; a claimant must also present evidence that these limitations significantly limited his or her ability to do basic work activities or impaired his or her capacity to cope with the mental demands of working. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1521(a), 416.921(a); *see also Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 144-45 (3d Cir. 2007).

If a claimant has any severe impairment, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g), 416.920(d)-(g). A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two and all impairments are considered at step four when setting the residual functional capacity. *See* 20 C.F.R. §§ 404.1523, 416.923 and 404.1545(a)(2), § 416.945(a)(2); *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005); *Shannon v. Astrue*, No. 4:11-CV-00289, 2012 WL 1205816, at *10-11 (M.D. Pa. Apr. 11, 2012); *Bell v. Colvin*, No. 3:12-CV-00634, 2013 WL 6835408, at *8 (M.D. Pa. Dec. 23, 2013).

Ultimately, the outcome of the case depends on the demonstration of the functional limitations of the impairment. *See Alexander v. Shalala*, 927 F. Supp. 785, 792 (D. N.J. 1995) *aff'd sub nom. Alexander v. Comm'r of Soc. Sec.*, 85 F.3d 611 (3d Cir. 1996); *accord*, *Walker v. Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006). Where the ALJ finds that Plaintiff suffers from a severe impairment, any failure on the ALJ's part to identify other conditions as severe or precisely name the severe impairment does not undermine the entire analysis, when ultimately the ALJ properly characterized the symptoms and functional limitations. *See e.g.*, *Lambert v. Astrue*, No. Civ. A. 08-657, 2009 WL 425603, at *13 (W.D. Pa. Feb. 19, 2009); *Alexander v. Shalala*, 927 F. Supp. 785, 792 (D. N.J. 1995) *aff'd sub nom. Alexander v. Comm'r of Soc. Sec.*, 85 F.3d 611 (3d Cir. 1996); *Faircloth v. Colvin*, No. Civ.A.12–1824, 2013 WL 3354546, at *11 (W.D.Pa.2013), *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n. 2 (3d Cir. 2007); *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("any error here became harmless when the ALJ reached the proper conclusion that [Plaintiff] could not be denied benefits conclusively at step two and proceeded to the next step"); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) ("[T]he ALJ considered any limitations posed by the [impairment] at Step 4 . . . any error that the ALJ made in failing to include the [impairment] at Step 2 was harmless").

Plaintiff fails to explain what additional limitations result from Plaintiff's alleged chronic fatigue syndrome, sleep apnea, and tinnitus (Pl. Brief at 16-18) and fails to meet his burden of showing that these impairments are severe. *See Bowen*, 482 U.S. at 146 n. 5.   As mentioned above, medical diagnoses alone are insufficient to establish severity at step two; a claimant must also present evidence that these limitations significantly limited his or her ability to do basic work activities or impaired his or her capacity to cope with the mental demands of working. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1521(a), 416.921(a); *see also Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 144-45 (3d Cir. 2007).   The ALJ properly considered, in totality, the objective medical evidence, in addition to evidence regarding Plaintiff's activities, testimony, and other information provided by treating and examining medical professionals.   In this instance, substantial evidence supports the ALJ's findings regarding Plaintiff's non-severe impairments.

## V.   Recommendation

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a

mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in

part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: December 28, 2016                    _____s/Gerald B. Cohn_____
                                            GERALD B. COHN
                                            UNITED STATES MAGISTRATE JUDGE